IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 13-cv-02842-RBJ

JIMMIE R. CROW, M.D.,

    Plaintiff,

v.

CITY OF COLORADO SPRINGS, d/b/a MEMORIAL HEALTH SYSTEM,
TERRY L. HUSKINS,
JEFF JOHNSON,
PATRICK FARICY, M.D., and
MICHAEL A. SCIALDONE,

    Defendants.

---

## ORDER

---

This case comes before the Court on Defendants Huskins', Johnson's, Faricy's, and Scialdone's (the "Individual Defendants") joint Motion to Dismiss [Doc. #12]. The Court has jurisdiction over this action under 28 U.S.C. § 1331. The motion became ripe for review on February 13, 2014 upon the filing of the defendants' Reply [Doc. #17].[1] For the following reasons, the defendants' motion is granted.

## BACKGROUND

The plaintiff, Dr. Crow, has been practicing medicine for 29 years. He has training and experience in General Surgery and Surgical Oncology, and he is Board certified in General Surgery. From November 1, 2002 until June 30, 2011, Dr. Crow practiced medicine as a partner

---

[1] The Reply exceeds the page limit listed in the Court's Practice Standards—five pages—by more than twice the permitted length. The defendants did not file a motion for leave nor did they explain the reason for the excessive length. As such, the Court has disregarded the Reply.

with Associates in General and Vascular Surgery ("AGVS") in Colorado Springs, Colorado. In 2011, Defendant Memorial Health System ("MHS"), an enterprise of the City of Colorado Springs, acquired the AGVS practice. As a result of the acquisition, Dr. Crow entered into an employment relationship with MHS—and thereby the City of Colorado Springs—for a term of one year beginning on July 1, 2011. Under the terms of the agreement, Dr. Crow was employed to perform General Surgery and Trauma services and to render other professional and administrative services.

Shortly thereafter, Dr. Crow fell off a ladder while working at his home and ruptured two cervical discs. The injury required surgery and resulted in a physical impairment in the form of cervical radiculopathy. This impairment functionally limited Dr. Crow's right upper extremity and the use of his right hand and substantially impaired one or more of his major life activities, including the ability to perform manual tasks. Because of this injury, Dr. Crow requested a leave of absence from MHS.

On October 27, 2011, Dr. Crow received a letter stating that the Board of Trustees had approved his request for a leave of absence effective September 10, 2011. The letter stated that "no leave of absence granted shall exceed a 12-month period unless for good cause an extension of time is approved by the Board." Amended Complaint [Doc. #5] at ¶ 17. According to the MHS Credentials Manual, "[a]bsence for longer than one year shall result in automatic relinquishment of Medical Staff appointment and clinical privileges unless an extension is granted by the Chief Executive Officer." [Doc. #12-3 at § 6.F(h)]. "A single extension of a leave of absence may be considered after requesting in writing only in extraordinary cases where the extension of a leave is in the best interest of the Hospital." *Id.*

On March 12, 2012, Mr. Huskins, the Human Resources Manager, sent Dr. Crow a letter notifying him that his approved leave had ended on that day, and that because Dr. Crow had not yet returned to work, his employment with MHS had been terminated. Dr. Crow challenged the termination on the grounds that it was inconsistent with the October 27, 2011 letter authorizing a 12-month leave of absence, that it violated his employment agreement, and that it violated MHS policy requiring a pre-termination meeting if an employee is unable to return to work at the end of an approved leave. In a letter dated April 18, 2012, MHS informed Dr. Crow that his employment had been reinstated retroactive to March 12, 2012. The letter added that Dr. Crow was to contact Mr. Huskins by April 24, 2012 to apply for a reasonable accommodation pursuant to the MHS Americans with Disabilities Act Policy (the "MHS ADA Policy") if he wanted to return to work with accommodations.

On March 27, 2012, while Dr. Crow's challenge to his termination was still pending, his primary physician Dr. Masferrer submitted a letter to Dr. Faricy, the Chief Medical Officer at MHS. The letter provided details concerning Dr. Crow's surgery, his functional limitations as of that date, and his prognosis for recovery. Dr. Masferrer cleared Dr. Crow to return to work part time (four hours per day) as of April 1, 2012, with an expectation that Dr. Crow would be able to return to work full-time by May of 2012. Dr. Masferrer sent a similar letter to Mr. Huskins two days later. Nothing came of these letters.

On April 24, 2012, Dr. Crow submitted his application for a reasonable accommodation under the ADA to Mr. Huskins. He requested a return to work on a limited practice basis with accommodations in the form of job restructuring and a modified work schedule. His application was supported by a statement from Dr. Masferrer concerning Dr. Crow's limitations and requested accommodations.

The MHS ADA Policy contains a two-step process for handling applications for reasonable accommodation. The first step is establishing whether the applicant has a disability under the ADA—the Individual Defendants do not dispute that Dr. Crow met this requirement—and the second step requires the employer to determine whether a reasonable accommodation is available to the disabled employee.

The Accommodation Evaluation Committee ("AEC") at MHS addresses the accommodation requests. In doing so, the AEC must determine what the affected employee's functional limitations and abilities are, whether an accommodation is needed to perform the essential functions of the job, and, if so, whether reasonable accommodations are available. The MHS ADA Policy provides that if no reasonable accommodation exists for the employee in his current position, MHS must determine whether a reasonable accommodation can be made through reassignment to a vacant position for which the employee is qualified.

The next AEC meeting was scheduled for April 25, 2012, a day after Dr. Crow submitted his application. On April 24, 2012, Mr. Huskins advised Dr. Crow that his application would be considered at that meeting so long as Dr. Masferrer faxed over the requisite paperwork. Dr. Masferrer faxed the paperwork to Mr. Huskins that same day, but Mr. Huskins did not submit Dr. Crow's application to the AEC.

On May 4, 2012, Mr. Huskins sent Dr. Crow an email stating that there were inconsistencies among his application, the supporting paperwork received from Dr. Masferrer on April 24, 2012, and Dr. Masferrer's earlier letters to Dr. Faricy and Mr. Huskins in March of 2012. Mr. Huskins requested clarification of the alleged inconsistencies as a precondition to submitting Dr. Crow's application to the AEC.

According to Dr. Crow, the inconsistencies to which Mr. Huskins referred involve the nature and extent of Dr. Crow's functional limitations and abilities, as well as the accommodations he was requesting. They did not go to whether Dr. Crow was ADA-qualified and therefore eligible for consideration by the AEC. Dr. Crow insists that the MHS ADA Policy does not grant Mr. Huskins the authority to make determinations regarding an employee's functional limitations and abilities or to refuse to submit an application to the AEC for review. Instead, under the policy, Dr. Crow's application should have been submitted to the AEC, and the committee could have requested any clarification it needed for its determination. Dr. Crow argues that Mr. Huskins refused to submit his application to the AEC in retaliation for Dr. Crow's having successfully challenged Mr. Huskins' earlier attempt to terminate Dr. Crow's employment.

On May 14, 2012, Dr. Crow responded to Mr. Huskins' email, explaining that the earlier letters from Dr. Masferrer were based upon projections from a March 3, 2012 office visit, whereas the paperwork submitted in support of Dr. Crow's ADA application was from his office visit on April 24, 2012. In spite of these explanations, Mr. Huskins continued to hold Dr. Crow's application instead of submitting it to the AEC.

In May of 2012, Dr. Crow submitted his application for reappointment to the Medical, Dental, and Pediatric Staff of MHS. On May 23, 2012, Dr. Faricy notified Dr. Crow that he had been reappointed to his staff position for the period of June 1, 2012 through June 1, 2014. Dr. Faricy also reminded Dr. Crow that his leave of absence was due to expire in September of 2012.

On May 24, 2012, Mr. Huskins sent Dr. Crow a letter in which he stated that he had not received "definitive" information from Dr. Masferrer regarding Dr. Crow's restrictions. Amended Complaint at ¶ 47. He then repeated the same questions from his earlier email and

stated that he needed Dr. Masferrer to answer those questions no later than June 14, 2012. Dr. Crow forwarded the letter onto Dr. Masferrer, who appears not to have responded.

On August 7, 2012, Mr. Huskins sent Dr. Crow a letter notifying him that MHS was closing his ADA file because "the clarification of information" had not been received from Dr. Masferrer. *Id.* at ¶ 54. Mr. Huskins added that if Dr. Crow was interested in continuing the ADA process, he should contact him. Due to a delivery delay, Dr. Crow did not receive this letter until August 27, 2012. On August 31, 2012, Dr. Crow sent Mr. Huskins a letter protesting the closure of his ADA file. On September 4, 2012, Mr. Huskins responded by reiterating that Dr. Crow's file had been closed because he had failed to provide information from his medical care provider, and that the file could be reopened "upon sufficient clarification" from his provider. *Id.* at ¶ 57.

On August 18, 2012, before receiving Mr. Huskins' letter regarding the closure of his ADA file, Dr. Crow sent letters to Mr. Scialdone—MHS's Chief Financial Officer and acting Chief Executive Officer—and to the MHS Board of Trustees requesting an extension of his leave of absence. Dr. Crow informed them of his pending ADA application, and that he had not yet received a determination on his application. He also informed them that his doctor had released him to return to limited practice as of April 1, 2012, but that MHS had not yet allowed him to return to work. On September 4, 2012, Mr. Scialdone sent Dr. Crow a letter informing him that his request had been forwarded to the Medical Staff office and would be reviewed at the September 6, 2012 Credentials Committee meeting. A copy of this request was also forwarded to Human Resources.

On September 11, 2012, Dr. Faricy drafted a letter to Dr. Crow instructing him to attend a pre-termination meeting on September 20, 2012. The letter stated that because of Dr. Crow's

"failure to provide supporting documentation as required under the MHS ADA Policy, despite repeated requests" and because Dr. Crow is "unable to perform the essential functions of the position even with the accommodations [he is] requesting, MHS is authorized under Section 4.1.2 of [the] employment contract to terminate [his] contract immediately." *Id.* at ¶ 60. Dr. Crow received this letter on September 18, 2012 via hand-delivery to his home.

On September 19, 2012, Dr. Crow sent Mr. Huskins an email protesting the closure of his ADA file. Among other things, he objected that Mr. Huskins had never informed him that Dr. Masferrer had not responded by the June 14, 2012 deadline, and that Mr. Huskins had not used the releases Dr. Crow had provided to obtain the necessary information directly from his medical providers. Dr. Crow requested that Mr. Huskins seek the clarification he required directly from his physicians.

The next day, on September 20, 2012, Mr. Huskins replied that he could do nothing further because Dr. Crow was scheduled to attend a pre-termination meeting that same day. He wrote, "Pending the outcome of your meeting today, we may discuss opening your ADA file if you are retained in employment." *Id.* at ¶ 66.

Later that day, Dr. Crow attended the pre-termination meeting along with his wife, Mr. Huskins, Dr. Faricy, and Mr. Johnson, the Vice President of Human Resources. The meeting had three focal points: (1) that Dr. Crow's leave of absence had exceeded one year in violation of MHS policy; (2) that Dr. Crow was ineligible to work; and (3) that Mr. Huskins had not received the documentation necessary to submit Dr. Crow's application to the AEC. At the meeting, Dr. Crow provided Dr. Faricy with a packet of information containing his ADA application and supporting documentation along with his communications with Mr. Huskins and other MHS personnel. Dr. Crow also informed Dr. Faricy that his condition had continued to evolve from

the time of his initial request for accommodation, and that his current conditions were less restrictive than they had been in March. Dr. Faricy responded that MHS needed Dr. Masferrer to substantiate Dr. Crow's medical condition and restrictions.

Mr. Huskins and Mr. Johnson eventually left the meeting. At that point, Dr. Faricy told Dr. Crow that the Credentials Committee and the Medical Executive Committee had approved his request for an extended leave of absence. However, Dr. Faricy then handed Dr. Crow a letter from Mr. Scialdone dated the same day—September 20, 2012—rejecting, without explanation, Dr. Crow's request. From what he could tell, his request had not been reviewed by the MHS Board of Trustees as it had been the previous year.

On September 29, 2012, Dr. Crow received a letter from Dr. Faricy notifying him that his employment had been terminated effective September 27, 2012 on the grounds that (1) his medical staff appointment and clinical privileges were automatically relinquished on September 10, 2012 because his leave of absence had surpassed one year, and his request for an extension had been denied; and (2) he was unable to perform the essential functions of his position with or without reasonable accommodations. [Doc. #12-5]. Dr. Crow responded with a letter dated October 2, 2012 protesting his termination and demanding reinstatement.

On October 11, 2012, MHS notified Dr. Crow that it would not reinstate him and directed him to pursue an action with the Equal Employment Opportunity Commission ("EEOC") if he believed his termination had been made in error. In December of 2012, Dr. Crow filed a charge of discrimination with the EEOC. On July 16, 2013, the EEOC issued Dr. Crow a notice of right to sue on his charge. Dr. Crow has timely filed this action within 90 days after receipt of the notice.

Dr. Crow asserts a number of causes of action against MHS and against the Individual Defendants. As against the Individual Defendants, Dr. Crow pleads claims under 42 U.S.C. § 1983 alleging violations of (1) his right to be free from deprivation of property without due process of law and (2) his right to equal protection of the laws. In a footnote to his Response he also suggests that his First Amended Complaint contained allegations sufficient to support a claim of a substantive due process claim. [Doc. #15 at 8, n.5].

The Individual Defendants move to dismiss all claims against them pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim, or, in the alternative, because they are entitled to qualified immunity. For the following reasons, the Court grants their motion.

## ANALYSIS

To survive a 12(b)(6) motion to dismiss, the complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While the Court must accept the well-pleaded allegations of the complaint as true and construe them in the light most favorable to the plaintiff, *Robbins v. Wilkie*, 300 F.3d 1208, 1210 (10th Cir. 2002), purely conclusory allegations are not entitled to be presumed true, *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009). However, so long as the plaintiff offers sufficient factual allegations such that the right to relief is raised above the speculative level, he has met the threshold pleading standard. *See e.g.*, *Twombly*, 550 U.S. at 556; *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008).

"[I]n general, a motion to dismiss should be converted to a summary judgment motion if a party submits, and the district court considers, materials outside the pleadings." *Prager v. LaFaver*, 180 F.3d 1185, 1188 (10th Cir. 1999). However, "the district court may consider

documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002).

To plead a claim for relief under 42 U.S.C. § 1983, a plaintiff must show that the defendant, acting under color of state law, deprived him of a right secured by the United States Constitution or its laws. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999). "A defendant may not be held liable under § 1983 unless he or she subjected a citizen to the deprivation, or caused a citizen to be subjected to the deprivation." *Lippoldt v. Cole*, 468 F.3d 1204, 1219 (10th Cir. 2006) (alterations and citation omitted).

Procedural Due Process

The Due Process Clause "protects against governmental deprivations of life, liberty, or property 'without due process of law.'" *Farthing v. City of Shawnee, Kan.*, 39 F.3d 1131, 1135 (10th Cir. 1994) (citing U.S. Const. amend. XIV). To assert a due process violation, a plaintiff must show that he possessed a protected interest under the Due Process Clause and was not afforded an appropriate level of process before being deprived of that interest. *See id.*

"[I]t has long been established that an employer cannot deprive an employee of a legitimate claim of entitlement to continued employment without due process." *Patrick v. Miller*, 953 F.2d 1240, 1244 (10th Cir. 1992). "[C]onstitutionally protected property interests are created and defined by statute, ordinance, contract, implied contract and rules and understandings developed by state officials." *Kirkland v. St. Vrain Valley Sch. Dist. No. Re-1J*, 464 F.3d 1182, 1190 (10th Cir. 2006). "A terminated Colorado public employee may state a claim for relief for deprivation of property without due process of law if rules or mutually explicit understandings . . . create a sufficient expectancy of continued employment to give the

employee a legitimate claim of entitlement." *Adams Cnty. Sch. Dist. No. 50 v. Dickey*, 791 P.2d 688, 695 (Colo. 1990).

Dr. Crow has pled that he had a legitimate claim of entitlement in his continued employment with MHS. In particular, Dr. Crow claims that the hospital's policies require a pre-termination hearing for any employee being terminated at the end of a leave of absence. The defendants argue that Dr. Crow could not reasonably rely on the hospital's policies when his employment contract contains a provision that allows for termination without cause. The Court is not so persuaded at this stage of the litigation. While the terms of the employment contract may create an uphill battle for Dr. Crow, MHS policies can also create mutually explicit understandings that entitle Dr. Crow to a legitimate expectation of continued employment. Given the legal (and possibly factual) complexity surrounding this issue, a final decision on whether Dr. Crow had a protected property interest is more apt for resolution on summary judgment or before a trier of fact. At this stage of the litigation, the Court finds that Dr. Crow has sufficiently pled that he had a legitimate expectation of continued employment with MHS.

"The essence of procedural due process is fair play; hence, the fundamental due process requirement is the opportunity to be heard at a meaningful time and in a meaningful manner." *Patrick*, 953 F.2d at 1244 (internal quotation marks and citation omitted). "This requirement includes three elements: 1) an impartial tribunal; 2) notice of charges given a reasonable time before the hearing; and 3) a pretermination hearing except in emergency situations." *Id.* "The procedural requisites and formality of pre-termination procedures vary depending on the importance of the interests involved and the nature of post-termination proceedings." *Langley v. Adams Cnty., Colo.*, 987 F.2d 1473, 1480 (10th Cir. 1993). "[T]he adequacy of pre-termination procedures must be examined in light of available post-termination procedures." *Id.*

11

"A fundamental principle of procedural due process is a hearing before an impartial tribunal. A tribunal is not impartial if it is biased with respect to the factual issues to be decided at the hearing." *Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 518 (10th Cir. 1998). "However, a substantial showing of personal bias is required to disqualify a hearing officer or tribunal in order to obtain a ruling that a hearing is unfair." *Id.* (internal quotation marks and citation omitted).

Dr. Crow has pled that his pre-termination hearing was procedurally deficient in part because he was not afforded an impartial tribunal. The MHS representatives at the meeting were Dr. Faricy, Mr. Huskins, and Mr. Johnson. In particular, Dr. Crow alleges that Dr. Faricy and Mr. Huskins were biased against him. First, Dr. Crow argues that the September 11, 2012 letter notifying him that MHS was considering terminating his employment shows bias on the part of Dr. Faricy, its draftsman. Dr. Crow claims that Dr. Faricy had already made up his mind regarding Dr. Crow's functional limitations, and that the pre-termination hearing was merely a formality. However, the letter did nothing more than provide Dr. Crow with notice of the charges against him, so to speak, so that he could properly defend his case at the pre-termination hearing. If anything, the letter is required under the second prong of the due process analysis,[2] and it therefore cannot be used against the hospital or Dr. Faricy as proof of bias in and of itself.

Second, Dr. Crow argues that Mr. Huskins was biased against him after Dr. Crow had successfully challenged his original termination in March of 2012. This claim is a mere conclusory assertion. Further, the pleadings do not suggest that Mr. Huskins was involved in the termination decision in any way. Therefore, even if he harbored a bias against Dr. Crow, it is unclear how it influenced the hospital's decision to terminate Dr. Crow's employment.

---

[2] "The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 546 (1985).

Next, Dr. Crow argues that two days' notice of his pre-termination meeting did not constitute reasonable notice under the second prong of the due process analysis. The Court recognizes that two days could certainly constitute too short a timeframe for proper notice. However, what constitutes timely notice is inevitably context-specific. In this case, Dr. Crow was not only able to attend the meeting on such short notice, but he also had supporting paperwork in hand which he offered to Dr. Faricy during the meeting. Dr. Crow's pleadings fail to contain any suggestion that he was at all harmed by the short notice. Therefore, the Court will not entertain a claim that the notice was procedurally insufficient.

Finally, Dr. Crow argues that he should have been afforded a post-termination hearing of some sort. Notably, he does not explain of what sort or in what way the facts surrounding his termination mandate such a hearing. While the Tenth Circuit mandates that the adequacy of pre-termination procedures be examined in light of available post-termination procedures, *Langley*, 987 F.2d at 1480, the Court has already found that the pre-termination procedures were adequate standing on their own. The Court is not aware of mandatory post-termination hearings for all terminated public employees in Colorado, and Dr. Crow presents no proof of such a rule.

The true crux of Dr. Crow's complaint is that his inability to obtain review from the AEC inevitably led to his termination. This claim is more appropriately alleged against MHS for its apparent failure to comply with the ADA, not against the Individual Defendants under the due process clause. On the face of the well-pleaded complaint, the Court finds that Dr. Crow received all of the process due under the Constitution. For this reason, his procedural due process claims against each of the Individual Defendants are dismissed.

Substantive Due Process

With that said, the Court recognizes that Dr. Crow certainly suffered grievances at the hands of some of the Individual Defendants. In particular, he was subjected to Mr. Huskins' arbitrary refusal to submit his reasonable accommodation application and Mr. Scialdone's unilateral refusal to grant an extension of his leave of absence. Though not articulately pled, the Court gives Dr. Crow the benefit of the doubt and interprets the First Amended Complaint as implicitly raising a substantive as well as a procedural due process claim. "Substantive due process protects fundamental liberty interests and protects against the exercise of government authority that 'shocks the conscience.'" *Koessel v. Sublette Cnty. Sheriff's Dep't*, 717 F.3d 736, 749 (10th Cir. 2013). "Substantive due process prohibits 'only the most egregious official conduct.'" *Id.* at 750 (citation omitted). "Even most intentionally inflicted injuries caused by misuse of government authority will not meet this standard." *Id.* (citation omitted).

The Tenth Circuit has never decided whether the right to employment is a fundamental liberty interest. *See id.* at 749. Even assuming that it is, however, Dr. Crow has failed to sufficiently plead that the actions of the Individual Defendants constituted truly egregious conduct. Taking Dr. Crow's allegations as true, Mr. Huskins acted arbitrarily and with a motive somewhere between indifference and contempt when he forced Dr. Crow to play a never-ending game of cat and mouse. Still, his actions do not meet the level of shocking the conscience, even if they were ill-willed. The same is true for Mr. Scialdone, who perhaps had little reason to deny Dr. Crow's request, but who nonetheless had a right to do so under the terms of the MHS Credentials Manual. Refusing the request, even if done out of sheer distaste for Dr. Crow, is not behavior that shocks the conscience such that it rises to a constitutional violation. Lastly, insofar as Dr. Crow asserts substantive due process claims against Dr. Faricy and Mr. Johnson, there is no basis in the pleadings to view their actions as misuses of their authority, let alone egregious

conduct. Therefore, Dr. Crow's substantive due process claims against each of the Individual Defendants are dismissed.

<u>Equal Protection</u>

Under the Equal Protection Clause of the Fourteenth Amendment, no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. In his Complaint, Dr. Crow alleges that the Individual Defendants abridged his equal protection rights by denying him the opportunity to be employed in a breast surgeon position at MHS because of his sex. Before discussing the delicate standard for classifications based on sex under the Equal Protection Clause, the Court first addresses whether Dr. Crow has sufficiently pled that any of the Individual Defendants proximately caused his alleged deprivation as required under Section 1983.

Dr. Crow asserts that at all times he was qualified to fill a breast surgeon position. He claims that MHS knew he was qualified because he had performed breast surgeries and had filled in for breast surgeons during his tenure at MHS. From June 2012 through Dr. Crow's termination in September 2012, MHS allegedly filled one or more breast surgeon positions with female surgeons without offering such a position to Dr. Crow. In addition, after Dr. Crow's termination MHS allegedly continued to advertise and fill breast surgeon vacancies without offering him the position or considering his application. Dr. Crow asserts that he should have been reassigned to a breast surgeon position under the MHS ADA Policy, and that the refusal to hire him in this position also constitutes an equal protection violation on account of his sex.

Dr. Crow has not pled any specific allegations concerning the role of the Individual Defendants in MHS's failure to hire him as a breast surgeon. Dr. Crow effectively asks the Court to read between the lines and find that these defendants somehow caused him to not be

considered for the breast surgeon position(s). These types of allegations are not well-pled, and are therefore not sufficient to withstand a 12(b)(6) motion to dismiss.

Qualified Immunity

Because each cause of action against the Individual Defendants has been dismissed, their qualified immunity defense is moot.

## ORDER

For the reasons set forth above, the Court GRANTS Individual Defendants' Motion to Dismiss [Doc. #12] without prejudice.

DATED this 5th day of May, 2014.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge